**AFFIDAVIT OF SPECIAL AGENT WILLIAM T. NOONAN IN SUPPORT OF
APPLICATIONS FOR SEARCH WARRANTS**

I, William T. Noonan, Jr., state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I have been a Special Agent with Internal Revenue Service, Criminal Investigation
("IRS-CI"), within the United States Department of the Treasury, since June 2009.  My duties as
a Special Agent include the investigation of criminal violations of the Internal Revenue Code and
related criminal statutes.  From June 2009 through December 2009, I attended the Federal Law
Enforcement Training Center in Glynco, Georgia, where I received training in conducting financial
investigations and in IRS-CI policies and procedures.  I also received training in the use of law
enforcement techniques such as search and seizure warrants.  From August 2004 through June
2009, I was employed as a revenue agent with the Internal Revenue Service ("IRS").  As an IRS
revenue agent, I reviewed and conducted audits of business and individual tax returns to determine
whether entities and individuals filing those returns reported and paid the correct amounts of
federal taxes.  I hold Bachelor's degrees in Accounting and Finance from Boston College and a
Master in Business Administration from Suffolk University.  I also hold a Juris Doctor from New
England School of Law and a Master of Laws in taxation from Boston University.

2.      As a Special Agent, I have participated in the execution of numerous search
warrants related to criminal investigations.  Through training and prior work experience, I have
become familiar with the types of records businesses typically maintain in the course of their
regular activity, including ledgers, journals, invoices, receipts, bank documents, and client files.  I
have received extensive training in accounting and financial investigation techniques.

3.      I am currently investigating Jake Miller ("Miller") and his company, Kostas
Roofing ("Kostas"), for attempting to evade or defeat the assessment or payment of tax in violation

of 26 U.S.C. § 7201, and for failure to file tax returns, in violation of 26 U.S.C. § 7203, for the tax years 2014 through 2020, as well as for wire fraud, in violation of 18 U.S.C. § 1343, and structuring financial transactions to avoid a reporting requirement, in violation of 31 U.S.C. § 5324 (together, the "Target Offenses").

4.      I submit this affidavit in support of an application for a warrant, under Rule 41 of the Federal Rules of Criminal Procedure, to search Miller's residence, located at 546 Worcester Street, Natick, Massachusetts 01760 ("the Subject Premises"), as described more fully in Attachment A to the proposed warrant.

5.      I also submit this affidavit in support of an application, under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure, for a warrant to search and seize records and data from the e-mail account patswin617@gmail.com (the "Target Account"), as described more fully in Attachment A to that proposed warrant.  Based on subscriber records for the Target Account, I have probable cause to believe that the Target Account and relevant data are maintained by Google, LLC ("Google"), headquartered in Mountain View, California, which, government databases indicate, accepts service of process through its Law Enforcement Request System online portal.

6.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrants and does not set forth all my knowledge about this matter.

### PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

7.      Miller is a resident of Natick, Massachusetts.  The government initiated this investigation of Miller based on deposits of large amounts of cash into Miller's personal bank

accounts.  Evidence collected by the IRS to date reflects that Miller used various check cashing businesses to cash checks that appear to be payments for services performed by Kostas.

### Kostas Roofing

8.      Investigators reviewed records maintained by the Massachusetts Secretary of the Commonwealth, which revealed that Kostas is not an incorporated business in Massachusetts and that Miller has not incorporated any businesses under his name with the Massachusetts Secretary of the Commonwealth.

9.      Internet sources list Kostas as located at 95 Freeport Street in Dorchester, Massachusetts.  Kostas has a website, www.kostasroofing.com, which states that Kostas is "Family Owned & Operated Since 1969."

10.     Investigators conducted surveillance on 95 Freeport Street in Dorchester, Massachusetts and observed no signs of Kostas operating at that address.

11.     On March 30, 2021, investigators interviewed the United States Postal Service ("USPS") carrier that delivers mail to 95 Freeport Street.  The mail carrier stated that he had delivered mail to 95 Freeport Street for approximately five years.  The carrier also stated, based on his knowledge of his mail delivery route, that Kostas has not been located at 95 Freeport Street for at least two years prior to when he started to deliver mail to 95 Freeport.  The carrier also stated that he occasionally delivers mail for Kostas to 95 Freeport Street, but that this mail is sent back as undeliverable.

12.     Investigators conducted a domain search for Kostas's website using an online search tool.  The domain search revealed that Miller registered Kostas's website on July 29, 2013. The contact information listed for the website is Jake Miller, Kostas Roofing, at 546 Worcester

Street in Natick, Massachusetts (the address of the Subject Premises).  The email address listed is the Target Account.

13.     Investigators reviewed credit card applications, car lease applications and loan applications that Miller submitted during the relevant time period.  Miller listed the Target Account as his email address on these applications.

14.     Records obtained from American Express, Barclays, CitiBank, and JP Morgan Chase show that Miller maintains multiple credit card accounts in both his name and under the business name "Miller Contracting."  These records reflect recurring charges to several of the accounts of thousands of dollars each month from two businesses that specialize in roofing supplies and a disposal services business.  All these credit card statements are sent to the Subject Premises.  Based on the nature of these charges, I believe that Miller used the name "Miller Contracting" to conduct Kostas's business.

15.     On July 26, 2021, investigators interviewed a homeowner ("Customer 1") regarding his interactions with Miller and Kostas.

16.     Customer 1 and his spouse lived in a condo complex in Everett, Massachusetts. Customer 1 served as one of three trustees of the complex's condo association.

17.     In July 2018, Customer 1 hired Kostas to replace the condo building's roof, which had begun to leak.

18.     Customer 1 met with an individual who introduced himself as Paul Kostas and who signed the contract for the roofing work at the condo building.  Customer 1 provided investigators with a copy of the contract, which was signed by Customer 1 and "Paul Kostas" in July 2018.

19.     Investigators presented Customer 1 with Miller's driver's license photograph and asked if Customer 1 recognized the individual in the photograph.  Customer 1 identified the

individual in the photograph as Paul Kostas.  Investigators separately presented Customer 1's spouse with the same photograph, and Customer 1's spouse also identified the individual in the photograph as Paul Kostas.  (I will refer to Miller as "Miller," although he consistently represented himself to Customer 1 as "Kostas").

20.     Customer 1 reported to investigators that Miller completed the roofing job on schedule with a crew of between six and eight workers.  At the end of the job, Miller accompanied Customer 1 to the roof for an inspection of the work.

21.     Customer 1 reported to investigators that, approximately one week after Miller completed the roofing job, the newly installed roof began leaking following a large rainstorm. Customer 1 phoned Miller, who visited the condo building to assess the problem.

22.     Customer 1 exchanged text messages and emails with Miller between September 2018 and February 2019.  Customer 1 provided investigators with copies of these text messages and emails.  Miller emailed with Customer 1 from the Target Account and signed emails to Customer 1 "Paul," with "KostasRoofing.com" appearing below the signature.

23.     Despite having indicated that he would address the leaking, Miller stopped responding to Customer 1's messages and never repaired the roof.

24.     Investigators interviewed two other former customers of Kostas.  One of these customers reported that he had corresponded with the Target Account.  Both customers stated that they had exchanged emails with a second email address, paul@kostasroofing.com.

25.     Information obtained by the government from MXroute, the email service provider for    the    paul@kostasroofing.com    account,    indicated    that    emails    addressed    to paul@kostasroofing.com are forwarded to the Target Account.

*Income Tax Evasion*

26.     Individual taxpayers generally are required to report accurately each year to the IRS their income and attendant tax obligations on a Form 1040, U.S. Individual Income Tax Return. The IRS uses Form 1040 to assess taxpayers' tax liability.  For federal tax purposes, individuals typically report gross receipts and expenses of businesses that they own as part of their Form 1040 on IRS Schedule C, Profit or Loss from Business.

27.     A review of IRS databases revealed that Miller has not filed any federal tax return for the years 2013 through 2020 and has not caused Kostas to file any federal income tax return for those years.  Based on information received during the course of this investigation, there is probable cause to believe that Miller failed to report all of the income he made from Kostas.  In addition to failing to report the income, he also took affirmative acts to conceal both the source of the income and who received it, by cashing checks to the business and depositing cash into his personal bank accounts.

28.     Based on my training and experience, I know that a common method of tax evasion is for a business owner to divert funds received from clients and customers as payments for goods and services away from the business bank account and into a separate bank account or to cash.  I further know that cash transactions are difficult, if not impossible, to trace.  Accordingly, business owners engaged in income tax evasion often cash checks and use cash transactions to conceal their receipt of income.  By concealing business receipts through cash transactions, as opposed to deposits into a business bank account, business owners can impede the IRS's assessment and collection of proper amounts of federal taxes.

29.     Evidence collected by the IRS to date reflects that Miller received checks that appear to be payments for services performed by Kostas.  Miller then cashed the checks instead of

depositing them into a business account for Kostas.  Miller subsequently deposited some of the cash receipts from these checks into checking accounts in his personal name.  Miller generally structured these transactions in amounts below the $10,000 threshold above which a bank must file a currency transaction report ("CTR").

30.     Records obtained from three separate check cashing businesses in Massachusetts revealed that, from August 2018 through November 2020, Miller cashed at least 42 checks at these businesses:

| Business | 2018 | 2019 | 2020 | Total | # of Checks |
|---|---|---|---|---|---|
| 1 | - | $64,600 | $80,496 | $145,096 | 26 |
| 2 | $83,000 | $47,400 | $111,000 | $241,400 | 15 |
| 3 | $21,000 | - | - | $21,000 | 1 |
| Totals | $104,000 | $112,000 | $191,496 | $407,496 | 42 |

31.     The checks that Miller cashed were payable to the following names: Kostas Roofing, Paul Kostas at Kostas Roofing, Paul Kostas Roofing, and 508 Sealcoating.

32.     These check cashing businesses require customers to present a driver's license and/or Social Security card in order to cash checks.  Records obtained from these businesses indicate that Miller presented his own driver's license and Social Security card to these businesses.

33.     Memo lines on the checks that Miller cashed indicate that the checks were written as payment for roofing jobs.  In addition to notations including the note "roofing," several of the checks had memo lines reading "Dep Roof," "Final Payment," "Deposit 1," "Payment 1," and "Payment #2 of 3."  Several of these notations suggest that customers issued additional checks to Miller that Miller did not cash at the three check cashing businesses that investigators have identified as businesses used by Miller to date.

34.     The memo lines on several checks also included what appeared to be invoice numbers that Miller provided to his customers, such as "2019-140," "2019-97," "2018-116," and "2019-77."

35.     Bank records obtained from Digital Federal Credit Union ("DCU") show that Miller maintains multiple checking accounts and credit cards at DCU under his name.

36.     Bank records from DCU revealed that, from November 2014 through February 2021, Miller received large, structured cash deposits into these checking accounts at DCU.

37.     A review of Miller's bank records revealed the following amounts of cash deposits in the years 2014 through 2020, totaling $1,777,728:

| Year | Cash Deposits |
|------|---------------|
| 2014 | $135,486 |
| 2015 | $210,401 |
| 2016 | $246,435 |
| 2017 | $344,020 |
| 2018 | $370,170 |
| 2019 | $248,846 |
| 2020 | $222,370 |

38.     Miller's bank records reflected that most cash deposits were made in amounts below the $10,000 CTR threshold.  Records indicated that Miller made frequent trips to DCU to deposit cash.  For the years 2014 through 2020, bank records obtained from DCU reflect that Miller visited DCU to make deposits on the following numbers of occasions:

| Year | Number of Cash Deposits |
|------|-------------------------|
| 2014 | 59 |
| 2015 | 63 |

8

| | |
|---|---|
| 2016 | 76 |
| 2017 | 77 |
| 2018 | 69 |
| 2019 | 44 |
| 2020 | 55 |

39.     By cashing checks received from customers as payments for services, instead of depositing them and reporting them as gross receipts, Miller evaded paying federal tax on the income received.

40.     I believe that Miller underreported his business income by at least the amount of the cash deposits that he made into his personal accounts detailed above in paragraph 37. Based on only these amounts of underreported income, the tax loss resulting from Miller's underreporting for each year is as follows:

| Year | Total |
|---|---|
| 2014 | $51,841 |
| 2015 | $85,230 |
| 2016 | $77,914 |
| 2017 | $149,561 |
| 2018 | $161,609 |
| 2019 | $100,363 |
| 2020 | $86,647 |
| **Total** | **$713,165** |

*Fraudulent Credit Card Applications*

41.     Credit card records obtained from JP Morgan Chase revealed that Miller opened 19 different credit card accounts with JP Morgan Chase: sixteen accounts under Miller's name and three accounts under the name "Miller Contracting."

42.     Investigators obtained the account applications for 12 of these credit card accounts. All 12 of these applications were submitted between 2014 and 2018 and listed the Target Account as Miller's email address.

43.     On nine of these applications, Miller listed his employer as "Natick Auto Clinic," located at 193 Worcester Street in Natick, Massachusetts.  On these nine applications, Miller claimed to receive annual income in amounts between $68,617 and $127,398.

44.     Leasing applications obtained from BMW Financial Services ("BMW") revealed that, from 2012 through 2020, Miller leased at least five vehicles from BMW.  Miller currently leases a 2020 BMW X5 for a 36-month lease term that ends in February 2023.

45.     A review of these five applications reveal that Miller listed his employer as Natick Auto Clinic located at 193 Worcester Street in Natick, Massachusetts.  On these five applications, Miller claimed to receive annual income in amounts between $60,000 and $100,000.  One of these applications lists the Target Account as Miller's email address.

46.     According to IRS databases, Miller was not issued a Form W-2 or Form 1099 from Natick Auto Clinic for any tax year between 2014 through 2020.  Further, Miller's bank records do not reflect any checks from, or deposits originated from, Natick Auto Clinic.  All records obtained in the course of this investigation indicate that Miller's sole employer during this period was Kostas.

### *THE SUBJECT PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE TARGET OFFENSES*

47.     I have probable cause to believe that the Subject Premises contain fruits, evidence, and instrumentalities of the Target Offenses, as described in Attachment B to the proposed warrant to search the Subject Premises.

48.     Through surveillance, a website domain search, information from USPS, and a review of various records, I have determined that Miller lives at the Subject Premises with at least two of his siblings and his father, and that Miller operates Kostas from the Subject Premises.

49.     Public records indicate that Miller's brother, Nick Miller[1] currently owns the Subject Premises.  Records obtained from the Massachusetts Registry of Motor Vehicles indicate that Miller and Nick Miller list the Subject Premises as their residence on their Massachusetts Driver's Licenses.

50.     USPS databases indicate that, in March 2021, USPS delivered to the Subject Premises mail addressed to Miller; Kostas; Nick Miller; Miller's sister, Annie Mitchell[2]; and Anna's.

51.     On February 10, 2021, an investigator called the phone number assigned to the Subject Premises, 508-653-7170, which also is the phone number provided on Anna's website. An individual who identified himself as John Miller answered this call.  Surveillance indicates that John Miller, Miller's father, resides at the Subject Premises.  The investigator told John Miller that

---

[1] Nick Miller owns and operates a sealcoating business, 508 Sealcoating, that lists the Subject Premises as its business address on its website and Facebook page.

[2] Annie Mitchell's birth name is Amanda Miller. On January 7, 2021, the town of Natick issued a business certificate to Annie Mitchell for Anna's Psychic Readings ("Anna's"), listing the Subject Premises as the business address.

the investigator was interested in having his fortune read.  John Miller took the investigator's number and indicated that one of his granddaughters would call the investigator to schedule a remote video reading via Zoom.[3]

52.     Investigators conducted surveillance at the Subject Premises on multiple occasions. Investigators observed a blue sign affixed to the Subject Premises with the words "Psychic Readings."  Investigators identified two trucks, both registered to Miller, parked at the Subject Premises on several occasions.  The beds of both trucks contained ladder racks, which I understand to be used to transport ladders for Kostas's roofing business.

53.     Bank records obtained from DCU show that Miller has account and credit card statements sent to the Subject Premises.  Miller also has the statements from American Express, Barclays, CitiBank and JP Morgan Chase, for the credit card accounts in his own name and under the business name "Miller Contracting," sent to the Subject Premises.

54.      Through my training and experience, I know that businesses typically keep detailed records of their customers' accounts, accounts receivable, payments received, payroll, and other financial details at their business locations.  I understand that businesses typically use these records to monitor the financial state of the business, track income and expenses, and aid in the preparation of federal and state income tax returns.

55.     From my training and experience, I know that it is common for individuals who are operating businesses to maintain records related to their businesses including, but not limited to the following:

---

[3] Surveillance and bank and credit card records that Miller has two daughters, Lolita and Selena, who reside at the Subject Premises and participate in psychic readings for Anna's.  John Miller indicated at the time of the call that Anna's had suspended in-person readings in light of the COVID-19 pandemic.

a)  Customer files and lists related to services provided;

b)  Records and/or documents memorializing the sale/distribution of services provided;

c)  Records and/or documents provided to customers in connection with services;

d)  Correspondence (including electronic correspondence) to and/or from actual or prospective customers, as well as correspondence (including electronic correspondence) to and/or from suppliers and partners/affiliates;

e)  Records and/or documents of mailings, shipping, or delivery, whether by the United States Postal Service or other private delivery services;

f)  Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business;

g)  Personnel and payroll/commission records for all employees that appear to be engaged in the business;

h)  Business or personal records related to the receipt, transfer and the expenditure of income received from the business;

i)  Bank records, credit card account records, brokerage account records, investment records, financial institution records, and any other records reflecting the receipt of income, transfer of assets, or expenditure of income produced by the business; and

j)  Other records and/or documents which appear to be related to the business including, but not limited to, notes, internal correspondence, external correspondence, memoranda, directives, and organizational charts.

56.     Based on my training and experience, many of these records typically are stored on computer media, and individuals typically retain these records for long periods of time.  There are many reasons why criminal offenders maintain evidence for long periods of time.  First, to the

offender, the evidence may seem innocuous at first glance (e.g., financial, credit card, and banking documents; travel documents; receipts; documents reflecting purchases of assets; personal calendars; telephone and address directories; check books; videos and photographs; utility records; ownership records; letters and notes; tax returns and financial records; escrow files; telephone bills; keys to safe deposit boxes; packaging materials; computer hardware and software).  To law enforcement, however, such items may be significant to the criminal investigation in light of other evidence.  Second, the criminal offender may no longer realize that he still possesses the evidence or may not believe that law enforcement could obtain a search warrant to seize the evidence.  The criminal offender may also be under the mistaken belief that he has deleted, hidden, or further destroyed computer-related evidence, which in fact may be retrievable by a trained forensic computer expert.

57.     Based on the facts set forth herein, there is probable cause to believe that evidence and instrumentalities of the Target Offenses (more particularly described in Attachment B) are presently located at the Subject Premises.

### *SEIZURE OF COMPUTER EQUIPMENT AND DATA*

58.     From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use computers to carry out, communicate about, and store records about their business operations.  These tasks are frequently accomplished through sending and receiving business-related email and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking,

financial, investment, utility, and other accounts concerning the movement and payment of money online.

59.     From my training, experience, and information provided to me by other agents, I also am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e mail, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

60.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

61.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability

(a "smartphone").  The percentage of adults that own a smartphone is even higher among younger demographic groups:  96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

62.     From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

63.     From my training, experience, and information provided to me by other agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

64.     Miller appears to use electronic devices to conduct Kostas's business and his own personal affairs.  Miller maintains a business website and an e-mail address associated with the Kostas business.  He also maintains Gmail account with an email address that he listed on credit card and lease applications, and from which he manages his business email.  Accessing, updating, and maintaining websites and email accounts require the use of electronic devices like computers or cell phones.  Moreover, the Kostas websites features photos of the company's work, contact information, reviews, and vendor information.  Records of photos uploaded to websites are typically stored on computers and cell phones.  Such records could provide information about customers and can be used to identify unreported income.

65.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a) Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b) Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Wholly apart from user-generated files, computer storage media, and in particular, computers' internal hard drive, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d)  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e) Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

17

paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how

and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j) In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

66.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a)  The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b)  Technical requirements – analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not

conducive to standard data searches.  Additionally, computer evidence is extremely

vulnerable to tampering or destruction, both from external sources and destructive code

imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the Subject Premises to be

searched or seize the computer equipment for subsequent processing elsewhere.

67.     The Subject Premises may contain computer equipment whose use in the crimes or

storage of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the Subject Premises during the execution of this warrant.  If the things described in

Attachment B are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site in order to determine their true

use or contents, regardless of how the contents or ownership appear or are described by people at

the scene of the search.

68.     The law enforcement agents will endeavor to search and seize only the computer

equipment which, upon reasonable inspection and/or investigation conducted during the execution

of the search, reasonably appear to contain the evidence in Attachment B.  If, however, the law

enforcement agents cannot make a determination as to use or ownership regarding any particular

device, the law enforcement agents will seize and search that device pursuant to the probable cause

established herein.

69.     In this case, I recognize that Kostas is a functioning company that performs some

legitimate business functions, and that seizing computer equipment may have the unintended and

undesired effect of limiting the company's ability to function.  As stated above, there are a variety

of reasons why law enforcement agents might need to seize the computer equipment for subsequent processing elsewhere.  If Kostas requires access to data that is not contraband or evidence of a crime, the government will work with the company after the search to copy this data onto storage media provided by the company for the company's use.

70.     If the search team determines that there is no reason to seize certain of Kostas's computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files.  Imaging permits the agents to obtain an exact copy of the computer's stored data and retrieve the records and data specified in the warrant from the image copy at a later date, off-site.

71.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### *THE TARGET ACCOUNT ALSO CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE TARGET OFFENSES*

72.     I also have probable cause to believe that the Target Account contains fruits, evidence, and instrumentalities of the Target Offenses, as described in Attachment B to the proposed warrant to search the Target Account.

### *Email Accounts*

73.     The Target Account is the email address that was provided to the domain provider for Kostas's website, Kostasroofing.com.  This email account is also Miller's email address of record with Barclays, Harbor One Bank and JP Morgan Bank where Miller holds business and personal accounts.  Miller also used this email address to correspond with Kostas customers.

74.     Miller also used the email account paul@kostasroofing.com to correspond with Kostas customers, and emails with the paul@kostasroofing.com account are forwarded to the Target Account.

75.     Kostas's website, https://kostasroofing.com, includes a "Request Estimate" page that allows web users to fill out a form to "request a free roofing estimate" from Kostas.  Based on my training and experience and that of other law enforcement, I understand that communications submitted via a form on a company's website typically result in email notifications to a linked email account.  Based on Miller's use of the Target Account and a second email address that forwards to the Target Account, there is probable cause to believe that the Target Account will contain communications initiated via Kostas's website, including communications to and from eventual customers.

76.     On or about August 18, 2021, Assistant United States Attorney David Holcomb sent Google a request under 18 U.S.C. § 2703(f) that the company preserve records associated with the Target Account for 90 days.

77.     Email providers such as Google typically allow customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

78.     Email providers also typically maintain electronic records relating to their customers. These records include account application information, account access information, and e-mail transaction information.

79.     Many e-mail providers can also provide the following additional information associated with a subscriber's account: address books; contact and friend lists; photos, files, data, or other information; and World Wide Web profiles or homepages.

80.     Based on the foregoing, I have probable cause to believe that Miller uses the Target Account to communicate with Kostas's customers, suppliers, contractors, employees, business partners, service professionals, and creditors, and that the Target Account will contain these communications, including communications evidencing the commission of the Target Offenses.

### *Legal Authority*

81.     The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

82.     Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e-mail provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A).  Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

83.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.  18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

84.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information.  Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

### *Request to Seal and Preclude Notice to the Target Email Subscriber*

85.     I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

86.     I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C. § 2705(b), the Court order Google not to notify any person (including the subscriber to whom the materials relate) of the existence of this application or the Court's Order for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known the target of the investigation, and its disclosure may alert the target to the existence of the investigation.  There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving the target an opportunity to destroy or tamper with evidence or change patterns of behavior. See 18 U.S.C. § 2705(b).  Moreover, some of the evidence in this investigation is stored electronically.  If alerted to the existence of the Order, the target could destroy that evidence,

including information saved to personal computers, on other electronic media, or in social media accounts.

### *Fourteen-Day Rule for Execution of Warrant for Electronic Evidence*

87.     Federal Rule of Criminal Procedure 41(e)(2)(A), (B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues this warrant, the United States will execute it not by entering the premises of Google, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

88.     Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

89.     The United States does not ask for this extra data or participate in its production.

90.     Should Google produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account holder(s), such as e-mail, absent a follow-up warrant.

91.     For these reasons, I request that the Court approve the procedures in Attachment B, which set forth these limitations.

## CONCLUSION

92.     Based on the information described above, I have probable cause to believe that Miller has committed the Target Offenses and that evidence, fruits, and instrumentalities of the Target Offenses (described in more detail in Attachment B to the propose warrant for the Subject Premises) are located at the Subject Premises (as described in Attachment A to that proposed warrant).

93.     Additionally, I have probable cause to believe that records and data from the Target Account (as described in Attachment A to the proposed warrant to Google) contain evidence, fruits, and instrumentalities of the Target Offenses (as described in Attachment B to that proposed warrant).

Sworn to under the pains and penalties of perjury.

Respectfully submitted,

William Noonan, Special Agent
Internal Revenue Service, Criminal Investigation

Subscribed and sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 30th day of August, 2021,

1:33 p.m.

Honorable David H. Hennessy
United States Magistrate Judge